## CASE OF THE EMPIRE CITY BANK.

*Supreme Court, First District; Special Term, September,* 1857.
*Again, General Term, May* 1858.

INSOLVENT BANK.—SPECIAL PROCEEDINGS.—STATUTORY CON-
STRUCTION.

In the act of 1849 (*Laws of* 1849, *ch.* 226), relative to closing up the affairs of an
insolvent bank, the provision prescribing the time within which the referee is
to make the apportionment, is directory only, and therefore an apportionment
made after the time prescribed, in pursuance of extensions of the time ordered
by the court, is not invalid.*

In proceedings under the act of 1849, to enforce the personal liability of stock-
holders, a stockholder, who is also a creditor, cannot offset his claim against his
assessment as a stockholder.

The person who was liable as a stockholder is the one in whose name the stock
stands on the books of the bank, although in fact it belonged to another person.

It is not necessary to inquire who were stockholders when the debts were con-
tracted. Those stockholders are liable who were such when the bank failed,
whether they were so or not when the debts were contracted.

A want of particularity in respect to certain debts of the bank, in the account pre-
sented by the receiver and referred to the referee, or the omission of the resi-
dence of some of the stockholders in the list of stockholders, does not affect the
jurisdiction of the court over the proceedings on the referee's report based on
that account, nor is any one not directly affected by such defect entitled to object.

It is not necessary that the receiver should, before making his report, distribute
all the moneys in his hands among the creditors.

It is not a ground of exception to the report, that the referee has counted as debts
certain claims which the receiver is resisting by litigation.

Stock of the insolvent bank held by an individual in trust for the bank, was not
thereby extinguished, but is valid in the hands of the trustee, and he is liable
as a stockholder to be apportioned therefor.

A stockholder cannot resist apportionment on the ground that he became such by
an illegal contract, or that he was induced to become such by fraud of the di-
rectors.

The act of 1849 is not unconstitutional.

---

* Pending the proceedings in this case, and after the time prescribed by the
statute had been exceeded, some of the stockholders moved for a perpetual stay
of proceedings, upon the ground that the delay, which had been allowed beyond
the time prescribed by the statute, operated to deprive the court of jurisdiction.
See the motion reported, 4 *Ante*, 118. It was there held that the statute was im-
perative, and that the delay did so operate; and the motion was granted. The
receiver appealed to the general term, where the order was reversed by consent,
the court not passing at all upon the question.

Case of the Empire City Bank.

In proceedings under it, it is not necessary that the referee should ascertain preliminarily whether the officers were not liable under the act of 1852 (*Laws of 1852, ch.* 71, § 4).

In proceedings under the act of 1849 to enforce the personal liability of stockholders in an insolvent bank, upon appeal from the judgment of the special term confirming the referee's report of apportionment, it was objected that it did not affirmatively appear in the proceedings that the bank was an association or corporation, " issuing bank notes to circulate as money."

*Held,* that the objection was well taken, and the judgment must be reversed. That fact must affirmatively appear in order to confer jurisdiction on the court. Such proceedings being special and summary, and in derogation of the common law, the statute must be strictly complied with.*

*September,* 1857.   Order to show cause why the report of the referee, in proceedings to close up an insolvent bank, apportioning its debts among its stockholders, should not be confirmed.

The Empire City Bank was organized under the general banking law, in January, 1852, and located in the city of New York.

In December, 1854, it suspended payment, and several petitions were presented to Mr. Justice Roosevelt, on behalf of its creditors, praying that a receiver might be appointed, and its debts be apportioned among its stockholders, pursuant to the " Act to enforce the responsibility of stockholders in certain

* CASE OF THE WESTCHESTER IRON COMPANY (*Supreme Court, Second District ; At Chambers,* 1856).—Henry Dubois and others, trustees of this company, presented their petition for the dissolution of the company, under the provisions of the Revised Statutes (2 *Rev. Stats.*, 467, § 59).

The facts appear sufficiently in the opinion.

BIRDSEYE, J.—The application does not conform to the statute in the following particulars :—It does not contain any statement of the books, vouchers, and securities relating to the estate of the corporation. (2 *Rev. Stats.*, 467, § 59, subd. 1.) It contains no statement of the encumbrances on the property of the corporation. (*Ib.,* subd. 3.)   It does not state the nature of the debt or demand due the several creditors, and the true cause and consideration of such indebtedness in each case.

I think it should also be stated that the stock not stated to be issued to the stockholders named, is still owned by or in the possession of the corporation ; or at least that it has not been issued.

I am also of opinion that the inventory of the estate is not such as the statute intends.   The-property ought to be identified,—to be so fully described, as, if it be lands, by metes and bounds, or by references to conveyances or otherwise, that the receiver may be enabled to take possession of the property.   Such an inventory, and a full statement of the books, vouchers, and securities relating to the

banking corporations and associations, as prescribed by the constitution, and to provide for the prompt payment of demands against such corporations and associations," passed April 5, 1849.

These petitions stated that the bank was an association organized under the general banking law, but did not state that it issued notes for circulation, under section 7 of article 8 of the constitution, which declares that "the stockholders in every corporation and joint-stock association for banking purposes, issuing bank notes, or any kind of paper credits, to circulate as money, after January 1, 1850, shall be individually responsible, to the amount of their respective shares in any such corporation or association, for all its debts and liabilities contracted after said 1st day of January, 1850."

Such proceedings were had before Mr. Justice Roosevelt that, on January 29, 1855, he granted an order that the bank was insolvent, and appointed the United States Trust Company its receiver.

On July 28, 1855, the receiver made its report, that it had received the sum of $38,118.15 from the assets of the bank, and had incurred expenses to the amount of $3,646.23 ; that it had declared and paid a dividend of $13,818.63 among the creditors of the bank, and retained in its hands $19,353.10 for certain preferred debts ; that the unpaid liabilities of the bank were then $140,889.81, setting forth particularly the names of the creditors, and the amounts due to each, in which was one item—"Not allowed, and may be litigated, $59,851.40." And the receiver also annexed to its report a list of all persons who, since the organization of the bank, had been stockholders thereof, with the amount of stock held by each.

On August 14, 1855, such report was referred to Stephen Cambreleng, with directions for him to apportion the said

---

property, will be required, in order to put it in the power of the receiver to be certain that he has received *all* the property, and to bring such actions, or take such other steps, as may be necessary to pay the liabilities of the company.

As the principal office for managing the affairs and business of the company is, by the articles of association, declared to be in the city and county of New York, though several other places in different counties are named where the operations of the company are to be carried on, the notice of the order should be published, and the hearing before the referee should be had, in New York.

The petitioners may withdraw their application for the purpose of conforming it, in the particulars above stated, to the statute.

debts of the bank among its stockholders, pursuant to said statute.

Section 18 of the statute requires the referee to make his report of such apportionment at the first special term of the court, after the expiration of six weeks from the time of his appointment, with power to the court to grant an extension of such time not exceeding ninety days.

And section 23 of the act declares that no apportionment shall be delayed or suspended by reason of any litigation or controversy, unless expressly ordered by the court, and such delay shall in no case exceed one year.

On October 29, 1855, on the application of two of the stockholders, and against the opposition of the receiver, an order was granted by the special term, suspending the apportionment for six months from that date ; and on April 28, 1856, on the same petition, a further extension of six months was granted—thus delaying the apportionment till October 29, 1856.

On December 16, 1856, the referee presented a petition to Mr. Justice Roosevelt for further delay, and an order was granted extending the time for making such apportionment ninety days from that date, or until March 15, 1857.

On March 4, 1857, the referee made his report of the apportionment of the debts of the bank among one hundred and twenty-six stockholders.

To his report, sundry of the stockholders, as well as the receiver, filed exceptions. Those which are desirable to the understanding of the question passed on, were, in substance, as follows :—

Exceptions by JONATHAN PURDY, and eight others, to the referee's report of apportionment of debts, and objections to the confirmation of said report.

I. That the report was not made within the time required by the statute, and the proceedings are therefore *coram non judice*, and void.

II. That the referee overruled such an objection duly made, and proceeded, notwithstanding such objection.

III. That the referee allowed as valid debts, various sums which were not valid and subsisting liabilities of said bank— (specifying them).

IV. That the account of the debts remaining unsatisfied after the dividend of the receiver, rendered by the receiver to this court, and by this court referred to said referee for the purpose of making such apportionment, did not in all instances contain a particular account of said debts and liabilities, as required by said statute.

V. That apportionment was made upon stock which had been purchased for said bank by its funds, and was held by individuals in trust for said bank, which said stock was thereby extinguished; namely, " E. F. Purdy, trustee for the bank," $1,275, and others.

VI. That the list and statement of the stockholders of said bank reported by the receiver did not contain the residence of each stockholder, as far as the same could be ascertained.

VII. That said referee allowed and regarded as debts and liabilities of said bank, certain certificates of deposit issued and signed by its officers, and certain checks on said bank certified by its officers, which were executed and delivered to agents to raise money on for said bank, but which were never used for said purpose, and were never valid debts or liabilities.

VIII. That said referee has made various erroneous apportionments in respect to the individuals apportioned, and to the amount of stock adjudged, and proven to be owned by each— (specifying them).

IX. That the said receiver did not, before making the report to this court, as required by statute, on the 13th day of August, 1855, divide and pay the moneys then in his hands, as such receiver, to and among the creditors of the said bank, but, contrary to the statute, retained a large sum—to wit, the sum of $19,353.10—which was not divided among and paid to said creditors, as by law was right and proper.

X. That the said Jonathan Purdy was, and is, a creditor of the bank, and entitled to be paid out of the assets, and ought, therefore, to have his claim offset and allowed against the apportionment made against him as a stockholder.

XI. That the referee has apportioned among the shareholders a larger amount of money than the whole amount of debts and liabilities of said bank, as reported by the receiver.

XII. That the referee has apportioned the debts and liabilities among 11,435½ shares of the capital stock of said bank, whereas

the whole number of shares outstanding at the time of the failure was 16,000, all of which was liable to such apportionment.

XIII. That from the report of the referee, it appears that the residences of the following named stockholders were ascertained to be in the city and county of New York, yet notice of the appointment and proceedings of said referee, as required by statute, was not served on said persons, either personally or by leaving a copy thereof at the residence of said stockholders, with some person of suitable age—(naming them).

XIV. That sundry persons who were stockholders of said bank, and liable as such, under the statute, to an apportionment for its debts, have not been apportioned at all by the referee.

XV. That by the statute, persons who were stockholders at the time of contracting of any debt or liability by the bank, are the persons who are liable to an apportionment for the payment of the same. Whereas the referee has made his apportionment among those who were stockholders at the time the bank became insolvent, and without any reference to or inquiry respecting the time when the debts were contracted.

XVI. That the referee has exempted from the apportionment sundry persons who were holders of stock, on the ground that they were holders only on hypothecation; but he has not inquired whether the stock was not forfeited to the holder by the non-payment of the debt secured.

XVII. That the referee has apportioned in some instances to the wrong person as the holder thereof.

XVIII. That the referee has apportioned in some instances on persons who were not stockholders.

Exceptions of J. CONNER, and seven others

I. The act of April 5, 1849, is in violation of article 1, section 10, of the constitution of the United States.

II. And of article 1 of the constitution of our State of 1846.

III. And of article 8, section 3, of the constitution.

IV. It is not in accordance with article 8, section 7, of the constitution.

The remaining exceptions of these parties were involved in these, or raised by the exceptions of Jonathan Purdy, *supra*, or are fully stated in the opinion of Mr. Justice Mitchell.

Case of the Empire City Bank.

Exceptions by the receiver of the Empire City Bank to so much of the report of Stephen Cambreleng, Esq., referee, as omits to charge the Chatham Bank as holders of 40 shares of the stock of the Empire City Bank, and to apportion to such bank its proportionate share of the debts and liabilities of the Empire City Bank.

I. Elias G. Drake, president of the Chatham Bank, appears, by the books of the said bank, to have been the holder of 40 shares of the said Empire City Bank, at the date of the default in payment of debts made by the said bank.

II. The said 40 shares of stock were transferred to the said Elias G. Drake, president of the said Chatham Bank, as such president, for the benefit of such Chatham Bank; and the name of the said Elias G. Drake, president of the Chatham Bank, was entered on the books of the Empire City Bank, open to public inspection, by and with the assent of the Chatham Bank.

III. The Chatham Bank is liable to the creditors of the Empire City Bank for its proportionate share of the debts and liabilities of the said Empire City Bank.

IV. The Chatham Bank should be charged in the apportionment, as holders of 40 shares of the stock, and should be assessed for its proportionate share of the liabilities of the Empire City Bank.

The same exceptions were filed by the receiver in several other instances where the referee had made the apportionment on the legal instead of the equitable holder of the stock.

Exceptions by E. F. Purdy, trustee.

E. F. Purdy was represented on the books of the Empire City Bank as the holder of 51 shares as trustee for said bank; and he objected to any assessments being made upon him in respect to said stock thus held by him as trustee; because,

I. It was unlawful to have said stock held by him as such trustee, and the transfer thereof to him was utterly void.

II. The stock was in fact owned by the said bank, said bank being the equitable owner thereof, although it appeared on the books of said bank as belonging to said Purdy.

III. By transfer to Purdy, as trustee for the bank, the stock was extinguished.

Exceptions by ISAAC O. BARKER, and two others.

I. Because the referee did not report to the justice of this court, holding the first special term in said city and county of New York after his appointment, the apportionment of the debts and liabilities of said bank among the stockholders, with the proofs taken by him, according to the act under which the proceedings herein have been taken.

II. That said referee has not made such report at any special term of said court, held in said county, to any justice thereof, since his appointment.

III. That time, exceeding ninety days, in addition to six weeks after the appointment of said referee, has been granted, to enable said referee to complete the apportionment directed, or to take further proof in reference to the same, contrary to, and in violation of, said act.

IV. That the proceedings before said referee, under the order appointing him, have been delayed, and time granted for making the apportionment and taking proofs in said order mentioned, for one year, contrary to said act.

V. That by reason of irregularities in said proceedings, and violations of the act aforesaid, jurisdiction therein has been lost, and said proceedings are invalid and void.

The exceptions to the referee's report, and an order to show why the report should not be confirmed, were heard at a special term before Mr. Justice Mitchell.

*J. M. Mason*, for the receiver.

*J. D. & T. D. Sherwood* and *John W. Edmonds*, for Purdy and others. *P. Y. Cutler*, for Poillon. *G. Clark*, for Harris. *S. Sanxay*, for Hough and others. *John E. Parsons*, for Struthers. *F. E. Mather*, for Peck. *T. Hitchcock* in person. *W. C. Wetmore*, for the U. S. Fire Insurance Company and another. *J. Leveridge*, for the Chatham Bank. *A. Dickenson*, for Leger. *Charles Tracy*, for Roberts. *Edwards Pierrepont*, for Conant. *Smith Barker*, for Scott. *W. A. Coursen*, for Garner. *H. B. Cowles*, for Talmadge.

MITCHELL, J. (after recapitulating the course of the proceedings).—1. Had the referee, or the court or justice, lost jurisdiction

by the delay? Whether the act, in prescribing the time within which certain acts should be done, did so to *prevent* action under it if there were delay beyond that time, or to secure prompt and immediate attention, is best determined by its objects and purposes. In the latter case, it was merely directory as to time. So is every provision of an act, as to time and manner, which enjoins a public duty, and is made to enforce its prompt performance.

The constitution of 1848 (article 8) declares that dues from corporations shall be secured by such individual liability of the corporators and other means as may be prescribed by law; and that stockholders in every banking association issuing bank notes, after January 1, 1850, shall be individually responsible to the amount of their respective shares for all its debts and liabilities contracted after that day. A duty was thus imposed on the Legislature to point out the mode in which this liability should be enforced; and accordingly, on April 5, 1849, it passed the law under which these proceedings are taken. It will be found that every provision is made with a view to insure dispatch, and to enforce the responsibility of the stockholder, and not with a view to exonerate him from a liability which the constitution imposed upon him.

Accordingly, the act is entitled, " An Act to enforce the responsibility of Stockholders." In an action against the corporation for a sum exceeding $100, the plaintiff is entitled to judgment at the end of twenty days, although the defendant puts in an answer, unless a judge orders a stay until the issue be tried (§ 5). If an execution be returned unsatisfied, the company is at once declared insolvent; and the same result follows if it neglect to pay any debt for ten days after demand of payment, unless the judge shall deem it " clearly solvent" (§§ 7, 8). Then it is enjoined from transferring any property, and a receiver is to be appointed of its effects. The receiver is to convert the securities into cash, *with the least possible delay*, and may sell *at auction* any of its demands; and within ninety days from his appointment, is to declare a dividend of *all cash* in his hands, unless the time be extended by a justice of the Supreme Court, which shall *not be for more* than ninety days (§ 12). Clearly, this section did not mean, that if he neglected to do for twenty days beyond the time prescribed what he was ordered to do in ninety

days, that he was not to do it at all. When it ordered him to proceed with the least possible delay to perform a duty in which the public was concerned, it did not mean that his delay for a week, or a month, or a year, should deprive the public of the only remedy provided for it, or should exonerate the stockholders, and leave the creditors without any redress; for section 1 declares that this "responsibility is to be enforced as thereafter provided, and *in no other manner.*"

It is plain that the object of the act can be accomplished only by regarding the injunctions in it against delay, and to do certain acts within a limited time, as directory, making it the duty of the officer to act within that time, but not avoiding his acts if he delay. It is like the case of a brigadier-general who was required by law to appoint a court-martial on or before the 1st of June in each year. The appointment made after that day was valid. In the same spirit, it is enjoined on the referee to make his report of the apportionment of the liabilities among the stockholders at the first special term of the Supreme Court after the expiration of six weeks from his appointment, or within such further period, not exceeding ninety days, as the justice may grant. Clearly, the remedy prescribed as the only remedy by the act, and required by the constitution, was not to be lost by the delay of the referee, or by the court granting more delay than the law authorized. With the same view, section 23 declares that neither the dividends nor the apportionments of the debts shall be delayed or suspended by reason of the pending of any litigation for or against the company, unless directed by a justice of the court; and such delay shall in no case exceed one year. No one will suppose that the receiver, by delaying to make dividends, would be exonerated from paying the money which he held. The same law applies to that duty as to making the apportionment of the liabilities. Delay, in either case, is a fault, to be met by the court enforcing performance of the duty, as promptly, and as nearly within the time required as possible, and not by creating interminable delay by vacating the only remedy provided by the statute.

This seems so clearly the true meaning of the law, that it is unnecessary to examine whether there was any delay not sanctioned by the law.

2. Can a stockholder who has a claim against the company

offset it against his liability? The statute makes no provision for any offset, and by necessary implication forbids it, by directing the apportionment of the liabilities to be made among the stockholders, "ratably in proportion to their stock" (§ 16). It thus establishes an invariable rule as to the amount to be paid by each; that is, as the whole number of shares is to his stock, so are all the liabilities to his share of the liabilities. It corresponds with the constitution, which makes the stockholders "responsible to the amount of their respective shares." This is a responsibility to creditors, and it announces to them, and to the stockholders, that whatever the debts of the company may be, each stockholder (if the company become insolvent) is not only to pay up his stock in full, if that has not been done, but is to pay, if necessary, a sum equal to the whole par value of his shares. This he is to pay, not to the company—he does not owe it to the company—but to or for the creditors; and if he be a creditor, he is to come in with the other creditors for his dividend. As he does not owe this extra payment to the company, but to the creditors, there is no reason to offset a debt due by the company to him. It is unlike a bankrupt or insolvent law. There all that the assignees can claim of a debtor to the insolvent is the *debt* due to the latter; that debt is interpreted or declared to mean the *balance* of accounts between debtor and creditor.

Here the stockholder is not sued for a debt due to the company, but is required to contribute, for the benefit of the creditors, a sum in proportion to his stock, which he (by implication of law) agreed to contribute for this specific purpose when he subscribed to the stock. No such offset can be allowed.

It would follow from the simple rule of proportion laid down by the act for the referee, and also from its omission to give him any power to inquire what stockholders are able to pay their assessments, that the assessment is to be made without reference to the solvency or insolvency of the stockholders. Courts of equity, when they take that matter into consideration, do it under the broad principles which regulate their conduct, and not under a statutory power.

3. What class of persons are responsible as stockholders? The third section throws this responsibility primarily on the person who is a stockholder at the time the debt or liability is con-

tracted by the company; but also shows there that it may be shifted entirely from him to another, declaring that he shall be exonerated in respect to any stock which shall have been *transferred* on the *books* of the company (previous to any default in the payment of such debt or liability) to a resident of this State of full age, in good faith, and without any intent to evade such responsibility; and the assignee is made responsible to the extent of such stock in the same manner as if he had been the owner at the time of the contracting of the debt, with the same power to transfer this liability to another by like assignment.

In several instances the stock of the company was pledged by the owners of it to persons lending money to them, and then transferred on the books of the company to the lender; and the question has been raised, " Can the holder be made liable in such a case ?"

In Roosevelt *a.* Brown (1 *Kern.*, 148), the Court of Appeals held the holder in such case liable under the act of 1811. The judges giving their opinion, rested them on the previous uniform decisions in this State, on the policy of the law, which was, that the creditor might have to look only at the books of the company, and who were stockholders there, in order to know whom he should trust; and on the fact that " stockholder" meant the persons holding the stock or its certificate, and having the right resulting from his having his name on the books of the company, and that where the right existed, there the liability extended.

The constitution, we have seen, imposes this liability on the " stockholder,"—a term which had acquired by decisions a precise meaning. The Legislature cannot take away that liability from that class, although it may extend it to others within its equity. The second section may therefore mean (what its language literally expresses) that the term " stockholder" shall apply to such as appear on the books to be such, and not only to them, " but *also* to every *equitable* owner of stock, although the same may appear on such books in the name of another person." But assuming that a liability of two sets of persons is not intended (as the other provisions of the act in many instances indicate), then the question is, what was meant by " *equitable owner of stock*" in this case ? It is a term used (unless something

shows a contrary intent) simply in contradistinction to the *legal owner*, and assumes that there is also a *legal* owner having the *legal* title. As when stock is held by one on the books *expressly* as trustee for another—the legal title would be in the first, the equitable title in the other; and if the first described himself as trustee, the creditors of the company would thereby receive notice that they were to give credit, not to him, but to another.

But the borrower of money who has transferred on the books of the company his stock to the lender even as security, has passed to the latter, who has accepted it, a title which on its face is perfect in the latter, and enables him to transfer a perfect title to any *bona fide* purchaser. He no longer owns the stock, but has a *right* to have it restored to him, not on demand, but on complying with a condition—paying the amount of the loan and interest. He has given to the other, and the other has accepted (until a retransfer be made), all the rights of a stockholder; and with those rights, as was said in Roosevelt *a.* Brown (*supra*), the pledgee assumes the liabilities of a stockholder. It is because the book (if correctly kept) is the evidence of liability, that the company is required to keep a book containing the names and *residences* of the original stockholders and of the assignees, and of the number of shares held by them respectively; creditors are to look to it, and from it to learn whom they may trust. It was said the book is only presumptive evidence, and that its effect may be repelled under the latter part of the fourth section. This does not diminish the force of the argument, that those truly entered on the books as stockholders are liable. The facts contained in the books are true. The lender chose to become the assignee, to protect himself and prevent the borrower from being able to transfer the stock. The latter part of section four applies only when some one has made an entry that is false, or authorized by the assignee.

The referee has adopted a different rule in some instances, as when Poillon was charged and Henry Leger discharged from his part of 240 shares. The report in this and similar cases will be corrected accordingly. [Here followed directions that the report be corrected in other similar apportionments.]

James Struthers lent to Sloan & Leggett $800 in November, 1854, on a note of thirty or sixty days, and a pledge and transfer to Struthers of 80 shares of the stock. The note was paid at

its maturity; but whether that was in December, 1854, or January, 1855, and after proceedings commenced against the bank, Struthers (on whom the burden of making out his defence lies) does not show. The note is not produced, and is supposed to be lost. If payment *before* the commencement of these proceedings would discharge Struthers, it is not proved. (Mr. Struthers' counsel admits in his points that the bank failed December 9, 1854, before the note matured.) At the time of payment the certificate of stock was handed over to Sloan & L.'s assignees with a power of attorney, probably executed by Struthers, but it was not transferred on the books of the bank. The act (§ 3) shows how a liability may be discharged, and makes essential to that purpose a transfer *on the books* of the bank, *previous* to any *default* in the payment of any debt or liability, as to which it proceeded against. It does not give this effect to an agreement to transfer, nor to a legal obligation to transfer, nor to payment; but it notifies the stockholders and the creditors that exoneration from the constitutional liability can be obtained only in one way—by a *transfer* on the *books*.

Although therefore payment as between the lender and borrower gives the latter a right to have the stock transferred to him, it does not make him a stockholder and transferee of the stock as against creditors.

On the principles before stated, Struthers became primarily liable as soon as the stock was transferred to him. He is accordingly to be charged as holder of 80 shares charged to Sloan & Leggett.

The loan made to Sloan & Leggett by Thos. W. Pearsall, does not differ in substance from the preceding one. The stock (100 shares) was transferred to Pearsall on the books of the company, as collateral security, and has since been paid; but at what time does not appear, and Pearsall never retransferred the stock on the *books* of the company. He must be charged as holder of 100 shares, charged to Sloan & Leggett.

William J. Staples claims to be exonerated from liability, because he sold his stock, November 7, 1854, at auction, to Sloan & Leggett, and passed over his certificate with power of attorney, and was paid the purchase money; but he did not cause the name of the assignee to be entered on the books previous to default in payment by the bank, and so omitted that

which the third section makes an essential to an exoneration from a liability which he once assumed. His objection to the report is disallowed.

Eighteen exceptions are taken by nine various parties, for whom Messrs. J. D. & T. D. Sherwood and Judge Edmonds appeared; they are alike in form. Some of them have been already noticed;—as that the report was not made in due time; that certain stockholders claim an offset, as the rule in case of pledged stock, or stock sold but not transferred.

It is objected that the account presented by the receiver to the court, and by it referred to the referee, was irregular, because it did not contain in all instances a particular account of the debts and liabilities. There is nothing to show that it did not contain as particular an account as the receiver could furnish. If it did not, the remedy for any one injured was to apply to the court to have it rectified. A defect in the report could not take away the jurisdiction over the proceeding, which the court acquired when the first order to show cause was granted; any subsequent non-compliance did not take away jurisdiction. It is not shown that any such omission can in any way affect the rights of the objectors; no one can object to an informality, in which another only has an interest. These answers apply also to the sixth exception, that the list of stockholders presented by the receiver did not contain the residence of *each* stockholder. If any stockholder who has not appeared has not received notice in consequence of this omission, and has sustained any injury thereby, the *court* would give him a hearing, but not vacate the whole proceeding on that account. The same answer applies to the thirteenth exception.

The ninth exception is, that the receiver did not pay over the cash in his hands before making his report in August, 1855. If this is so, it neither increases nor diminishes the amount of the liability of the stockholders. The cash in hand must have been credited against the liabilities of the company (unless properly reserved for other purposes), before the assessment was calculated among the stockholders.

The eleventh exception was waived, as the amount was but a few dollars. The fourteenth exception, that sundry stockholders who are liable were not so reported by the referee, has been allowed in part, by directing certain corrections of the report.

The third exception states that the referee allowed four certain debts as valid, which it alleges are not valid.

1st.  A loan by Beebe & Co. to the bank for  .  .  .  $3,730.94
2d.  A deposit by the Sixpenny Savings Bank  .  .  .  7,011.30
3d.  A deposit by the treasurer of the State  .  .  .  16,056.01
4th.  Certain claims allowed to certain persons by referees appointed in a judicial proceeding, amounting all together to .  .  -  .  .  .  .  .  59,851.40

The first, it was admitted, has been paid in full.  The third probably has been paid in part.  As to the fourth, the receiver denies the legality of the recovery, and means to test the question by appeal.  But it is plainly the policy of this law, that the assessment on the stockholders and the collection of the assessments shall not be delayed by litigated claims pending in court, whether brought by or against the bank; nor by an inadvertent omission to credit the bank with a payment of a small debt due by it.

A perfect remedy can be given to the stockholder by the *court*, when the whole affairs of the bank are finally closed up, by ordering the repayment to each stockholder of any amount which he may have paid in excess of his proper share.

The report of the receiver contained (as I infer from the list annexed to the referee's report) this memorandum in the list of stockholders :—

| Names. Stockholders. | Residence. | No. of Shares. |
| --- | --- | --- |
| E. F. Purdy, trustee, | New York, | 51 |

Proof, in some way, was given to the referee that Mr. Purdy had bought these shares as trustee for the bank.  He contends that the shares were thus extinguished; that no transfer can be made to a trustee for a bank, but must be made to it directly. (1 *Rev. Stats.*, 591, § 7.)

The Revised Statutes forbid any corporation reducing its capital stock without the consent of the Legislature (1 *Rev. Stats.*, 601, § 2); and when its stock is pledged or hypothecated to it, and the loan not paid, the stock is to be sold to others in sixty days, and if not so sold, the capital stock is deemed temporarily reduced thereby, and no dividends can be declared *until the*

*deficit·* in the capital stock shall be made up from subsequent profits. (1 *Rev. Stats.*, 591, § 6.) Thus it is unlawful for a bank voluntarily to extinguish any portion of its capital, and equally unlawful for any one to aid in doing it. It is equally against the principles of the constitution and of the act in question ; for the bank might thus extinguish the liability of favored stockholders to creditors. The transferer . to Mr. Purdy was liable before the assignment. Mr. Purdy has taken his place and liability, inasmuch as he does not hold in trust for one who can be made liable to creditors, and the bank had no right to extinguish its stock. It is a solecism to say that one *holds* in trust for a bank, when the trust is, that the property shall immediately cease to be.

The fifth exception is overruled. The seventh is intended as an enlargement of part of the third.

The eighth exception points out the error in the number of shares assessed to John P. Hone, and alleges like errors as to certain other persons. The error is directed to be corrected as to Hone. As to the others, there is no reference to any part of the evidence as sustaining the charge. That reference may still be made, if done promptly.

The twelfth exception is, that the whole number of shares of stock is 16,000 ; but the referee has assessed only 11,435½ shares. The answer given was, that this last was all that the referee could find that was held by any person, and there is nothing to show that such is not the fact. It may be that all the stock was not subscribed. If the objectors can show that there are other stockholders, and who they are, they will have the benefit of this objection ; and such persons will be charged, and the others reduced accordingly. Until this is done, the report must stand as it is. Even when the report is confirmed, it might be kept open so far as to allow these matters to be proved.

The fifteenth exception is, that the referee has made the assessment among all who were stockholders when the bank failed, and not among those who were such when the debts were contracted. The referee in this conformed to the 3d section, which makes primarily liable those who are stockholders when the debt is contracted, but exonerates them, and transfers their liability to their assignee, when the transfer is made previous to *any default* in the payment of such debt or liability.

Peter Poillon, Jr., is charged with 440 shares, besides 80 standing in his name. As to the 440, the error is already directed to be corrected.

He objects to any liability, because he says that the original stock of the bank was but 16,000 shares, and refers to a certificate showing that that amount had been paid in—not that such was the whole capital; and he also shows that no certificate was filed of any increase of capital, and infers that the stock issued to him was on the increased capital, and insists that the increase was illegal, and so the stock void. Secondly: He shows that he, by his own arrangement with the bank, paid for the stock by obtaining a discount of his friends' notes with his name on; this he also says was contrary to law, and so, he insists, prevents the stock from having any vitality.

He subscribed in this way for five hundred shares ($12,500), and passed away 440 of them to others, and received full value for them. The laws to which he refers (1 *Rev. Stats.*, 601, § 2) were passed, not to protect the purchaser of such stock, but to protect the public, and to make him pay in cash, or securities equivalent thereto. It would defeat the very purpose of the law if he, the contriver of the unlawful act, after the contract was *executed*, and he had reaped all its beneficial fruits, could turn around and say it was all unlawful, and that he does not hold the stock. The contrary principle has been repeatedly adjudged in this court in actions by receivers, and has been adopted by the Court of Appeals. Neither defence can avail him now.

Joseph O. Dorr, and others, appearing by G. Clark, Esq., besides other objections already noticed, except to the report, because they say the stock held by them was transferred to them by directors of the bank with the intent to defraud them—the directors knowing that the bank was insolvent, and representing the stock to be worth par.

Whatever right such facts, if proved, might give these parties to rescind their contract as between them and the sellers of the stock, it gives them no such right as against the creditors of the bank. The latter have had no part in the fraud, and are not to be injured by it: the remedy of these parties is against the wrong doers. But even as against them, one thing should have been done before a complete cause of action would arise, and that is, to return or offer to return the stock. This these

parties did not do before the insolvency of the bank, and have not yet done.

The facts stated in favor of D. Harris, and not denied, would make him a creditor of the bank for rent due to him, but to what amount does not appear. This may be corrected by reference to the proofs, if they are sufficient, or by a new reference; but it may not alter the assessment.

Elisha Peck objects to being charged with two parcels of 20 and 30 shares, transferred to him January 20, 1854—part of 85 shares with which he is charged. The stock was actually transferred to him in the books of the company, and it is immaterial whether he held them for the bank or not. If he had transferred these shares, he may refer to the proof of that fact.

Mr. Sanxay appeared for various parties, and raised some objections which have not yet been noticed.

It is said that the act in question "impairs the obligation of contracts;" that the general banking law of 1838 was a contract between the public and the shareholders of all associations under it, and imposed no liability on the stockholders beyond the one payment of their subscription; and so this act is unconstitutional. (*Const. U. S.*, Art. I., § 10.) This section of the constitution has never been applied to a law regulating the *conduct* of parties or companies, or the *remedies* against them. The bank owes all that is required to be paid by its members, and the obligation on them only took effect prospectively—namely, as to debts contracted after January 1, 1850. The new law of 1849 therefore became a part of all contracts made by the stockholders through their officers after that day. The act of 1838 also contained (§ 32) the express power in the Legislature at any time to alter or repeal it; the stockholders subscribed subject to that express power. The bank (it is believed) was incorporated since the act of 1849.

It is said the act violates sections 1, 2, and 6 of article 1 of the constitution of this State, declaring that " no member of this State shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers;" that trial by jury, in all cases in which it has been heretofore used, shall remain invioalte forever; and that "no person shall be deprived of life, liberty, or property, without due process of law."

It is not perceived that any of these provisions are applicable, except so far as they secure a trial by jury in *all cases* in which it had been used prior to the constitution of 1846. *Trial* by jury was not used in cases like this. Corporations, like individuals, may become insolvent; the proceedings in such cases are and have been summary, and without a jury. The same constitution which preserves these rights imposed this liability on the stockholders (art. 8, § 7), and left no *issue* of fact or law to be tried by a jury, but a mere ministerial duty to be executed—a sum in the rule of proportion to be performed, and nothing more. A mere assessment (even of damages) does not require a jury; a *trial* by jury means the trial of an *issue* joined. Here no *issue* need be joined. The question whether a corporation or an individual was insolvent, has habitually been passed upon by a court or a judge, and not by a jury.

The constitution (art. 8, § 3) declares that " all corporations" shall have the right to sue, and shall be subject to be *sued* in all courts, in like *cases*, as natural persons.

It is said this act subjects this corporation to be sued in a case in which a natural person is not so subject. If an individual is insolvent, he may be proceeded against as such, and an assignee may be appointed to collect all that is payable to his creditors. This is what this act does—the receiver being the assignee, and he also collecting from stockholders what the constitution requires them to pay.

It is said that " no opportunity was allowed by this act to the stockholders to test the *bona fides* of this proceeding, nor to have a trial, nor to ascertain the amount nor the validity of the alleged claims against the bank, nor of the proceedings for the appointment of a receiver.

When this objection was stated, the counsel was notified that he *then* had such opportunity, and that any proofs as to any of those matters would then be heard. Section 19 of the act of 1849 directs the report of the referee to be made at " a special term of the Supreme Court," and that " the justice holding such term shall proceed to examine the same, and hear the *allegations* of the parties and *persons interested*, and may modify or amend the same, or may refer the same back to the same or another referee for further proof or examination, or may confirm the same." If a liberal interpretation of these words is neces-

sary to do justice between the parties, and to sustain the law, it should be given to them. As the case is by express terms brought (by this section) before "*the court*," the court may, in the exercise of its general powers, do any act which it might do in any action to protect the rights of any party.

It is said that the referee should have ascertained preliminarily whether the directors and officers were not liable under the act of March 19, 1852 (*Laws of* 1852, *ch.* 71, § 4); and if so, should have enforced such liability.

The constitution does not require this preliminary examination, nor does the act of 1852 interfere with the act of 1849.

It is said the constitution only applies to stockholders who have not paid their stock in full. If this were so, it would not inhibit the Legislature from making them still further liable for debts thereafter to be contracted by their officers. But the constitution contains no such restriction; it applies to all stockholders, whether they have paid or not, making no such discrimination. He is much more properly termed a stockholder who has paid for his stock, than he who has received a certificate and has not paid for it. The liability to pay the amount originally subscribed was already sufficiently established by law, and the framers of the constitution would not embrace in it so needless a provision.

It was alleged that the bank and the receiver had no existence, in consequence of non-compliance with some requirements of law. No proof was produced to that effect.

It is said that it was not competent to vest these proceedings in a judge out of court. Proceedings in like cases (insolvent cases) have in our State been generally before a judge out of court. While the term "justice" is used in the act, it does not follow that the justice may not, under it, act *in court*. These proceedings are entitled as at special term; the preliminary proceedings might be before a judge out of court, and be valid, as the act provides for a hearing in court (§ 19), when all parties can be heard and all questions discussed.

It is said the referee has not annexed to his reports exhibits, &c., used before him. The counsel was, at the hearing, notified that any papers, &c., used before the referee, would be produced on being called for.

Complaint is made that the act gives no notice to the stock-

holders of the preliminary proceeding against the corporation, and no personal notice of the reference. Those who attend in court, and are heard on all questions, cannot have a right to raise this objection : they must object for themselves, not for others, who, perhaps, disclaim the defence. The stockholders have no right to any notice of proceedings against the bank only. The Legislature may prescribe how notice shall be served, when it is to affect the stockholders. The stockholders become such under this act, and therefore know that when their bank ceases to pay its debts, they will be bound to pay their fair proportion of the debts, and thus have notice to inquire into the proceedings against the bank, and to protect their own interests. · As before stated, any one aggrieved by want of notice could be relieved by "the court at special term," under its general powers.

The other objections have, it is believed, been already noticed. The report will be confirmed, except where it is otherwise directed in this opinion.

*May*, 1857.   Appeal from the order confirming the report.

From this decision twenty-eight of the stockholders appealed to the general term, and the appeal came on to be heard May 20, 1858.

*John W. Edmonds*, for Purdy and others.   (The points made by the learned counsel are all fully stated in the exceptions of Jonathan Purdy.   The following is the substance of his very elaborate argument upon the questions raised by the first and the sixteenth of those exceptions :)—

*First.* The apportionment, not being made within the time specified in the statute, the whole proceeding becomes *coram non judice* and void, because the statute is peremptory, and not merely directory, for the following reasons :—

On a question whether a statute is directory or peremptory, it is necessary to look for the principle on which it is held to be one or the other.

In many of the cases no reason is given. The court merely say that it is directory. *Sic volo sic jubeo* is the decision. · Of that character are the cases of Wood *a.* Chapin (3 *Kern.*. 515) ;

The People *a.* Chenango (4 *Seld.*, 317); Gall *a.* Mead (2 *Den.*, 160); Marchant *a.* Langworthy (6 *Hill*, 646); Striker *a.* Kelly (7 *Hill*, 9); The People *a.* Allen (6 *Wend.*, 486).

But in many of the cases, particularly in the English courts, reasons are given, and from them we can deduce the following rules :—

I. Where a provision is introduced for public purposes, and not merely affecting the action of an individual, the statute is peremptory. (Rex *a.* Hipswell, 8 *Barnw. & C.*, 466 ; Rex *a.* Gravesend, 3 *Barnw. & A.*, 240.) Apprentices' indentures were void, because for a longer period than the act warranted. (*Dwarris on Stat.*, 612 ; People *a.* Schoonmaker, 3 *Kern.*, 243.) The comptroller's warrant on the treasury void, because it contained no reference to the statute. (Corwin *a.* Erie Railroad Company, 3 *Kern.*, 45.) Duty of railroad companies to maintain fences. (Wibert *a.* Erie Railroad Company, 2 *Kern.*, 245.) Duty of railroad companies to carry forward freight and passengers with all convenient speed. (Oakley *a.* Aspinwall, 3 *Comst.*, 550.) A judge's sitting when related to the parties.

II. When an act is permissive alone, it is directory. (Rex *a.* Gregory, 2 *Add. & E.*, 99.)

III. Where an act contains mere matter of direction, and nothing more, it will be regarded as directory. (Pearse *a.* Morris, 2 *Ad. & E.*, 94 ; *Dwarris on Stat.*, 606.)

IV. Where an act contains negative words, it is always imperative ; and so will be affirmative words when they are absolute and explicit, showing that no discretion is intended to be given ; and especially so where jurisdiction is conferred. (*Dwarris on Stat.*, 611 ; Gall *a.* Mead, 2 *Den.*, 160.)

V. So it is where the statute prescribes a particular form or manner of acting : as in summary convictions (*Dwarris on Stat.*, 611 ;) and in cases of sheriffs' bonds (*Ib.*, 638 ; Kerrison *a.* Cole, 8 *East.*, 331).

VI. So it is peremptory where the act provides a cheap and prompt remedy, or mode of settling controversies : as in the case of depositors in savings banks. (Crisp *a.* Bunbury, 8 *Bing.*, 394 ; *Dwarris on Stat.*, 612.)

VII. A statute prescribing terms and time is peremptory (*Dwarris on Stat.*, 646 ; 5 *Bro. P. C.*, 438) : as in case of insolvent notices, whether ten weeks or six (Matter of Underwood,

3 *Cow.*, 59); and notice of redemption on sales for assessments. (Doughty *a.* Hope, 1 *Comst.*, 79; S. C., 3 *Den.*, 602.) Especially is it so when the enactment shows that the designation of time was intended as a limitation of power. (Court-martial Case, The People *a.* Allen, 6 *Wend.*, 486.)

VIII. So an act is peremptory, when it takes away a trial by jury. (*Dwarris on Stat.*, 646 ; Lookes *a.* Halcom, 4 *Bing.*, 183.)

IX. So when it gives a summary proceeding, in derogation of the common law (*Dwarris on Stat.*, 652; Pool *a.* Neal, 2 *Sid.*, 63): as in proceeding for disturbing a religious meeting. (Bigelow *a.* Stearns, 19 *Johns.*, 39 ; Hartley *a.* Hooker, *Cowp.*, 524.)

X. So it is peremptory where it is merely a direction to the court as to evidence : as a comptroller's deed on sales for taxes. (Hand *a.* Ballou, 2 *Kern.*, 541.) So on statute foreclosure of mortgage. (Stanton *a.* Kline, 1 *Ib.*, 196.)

XI. So where a public officer is exercising a statutory authority (Palmer *a.* Plankroad Company, 1 *Kern*, 386 ; Webb *a.* Albertson, 4 *Barb.*, 81): as under the banking law, where comptroller may reassign mortgages (Mitchel *a.* Cook, 3 *Seld.*, 538) ; as where a common council may direct a grade, they cannot let their superintendent of roads do it (Thompson *a.* Schermerhorn, 2 *Seld.*, 92) ; as where surrogate is directed to appoint a guardian *ad litem* for sales. (Bloom *a.* Burdick, 1 *Hill*, 130.)

XII. So where a statutory remedy is given : as in bringing patent suits in the State courts (Dudley *a.* Mayhew, 3 *Comst.*, 15) ; as in partition cases, requiring an affidavit as to the unknown owners. (Dunning *a.* Roberts, 11 *Wend.*, 648.)

XIII. So where the proceeding tends to divest one of his property : as in the six months' notice in assessment cases (The People *a.* New York, 10 *Wend.*, 393) ; notice to occupant on tax sales (Jackson *a.* Esty, 7 *Ib.*, 148) ; demand at dwelling-house for United States taxes (Jackson *a.* Shephard, 7 *Cow.*, 88) ; place of sale by loan-officers (Denning *a.* Smith, 3 *Johns. Ch. R.*, 332 ; Sharp *a.* Spier, 4 *Hill*, 84) ; notice to owner of intention to take land for a street (Sharp *a.* Johnson, 4 *Hill*, 98) ; order for sale by surrogate (Atkins *a.* Kinnan, 20 *Wend.*, 241) ; only two of three assessors acting (Doughty *a.* Hope, 1 *Comst.*, 79 ; Powell *a.* Tuttle, 3 *Ib.*, 405) ; sale by loan-officers at wrong time (Sherwood *a.* Read, 7 *Hill*, 431).

XIV. So where the act prescribed is of the essence of the thing. (Marchant *a.* Langworthy, 6 *Hill*, 646 ; per Lord Mansfield, 1 *Burr.*, 447.)

XV. And so where the enactment is a statute of limitations, as in the act of 1849 it clearly is, for there is no other limitation to the enduring liability of stockholders. In this and various others of the acts passed to carry out the individual liability clauses of the constitution, a limitation was intended to be provided in this form

*Sixteenth.* The special term ruled that persons holding stock in pledge or hypothecation are liable as stockholders, when the statute imposes the liability only on the real owner.

The constitution enacts (art. 8, § 2), that dues from corporations shall be secured by such individual liability of the corporators, and other means, as may be prescribed by law; and by art. 8, § 7, that the stockholders in, &c., shall be individually responsible to the amount of their respective share or shares of stock, &c., for all its debts and liabilities of every kind, &c.

The act of 1849 (340, *ch.* 226) is entitled "An act to enforce the responsibility of stockholders in certain banking corporations and associations, as prescribed by the constitution," &c.; and section 1 provides that whenever default shall be made in the payment of any debt, the stockholders shall be responsible, equally and ratably, for the amount of such debt to the extent of their shares.

Their liability is to be enforced as in that act prescribed, and in no other manner.

Thus far it was the old provision as to the personal liability of stockholders, on which the courts had already passed.

Thus in Marcy *a.* Clark (17 *Mass.*, 330), where the doctrine of personal liability had preceded us, it was held that one who made a fraudulent transfer for the purpose of avoiding liability might be held. In Moss *a.* Oakley, in 1842 (2 *Hill*, 265), it was held that the liability attached to him who was a stockholder *when the debt was contracted.*

In Adderly *a.* Storms, in 1844 (6 *Hill*, 624), it was held, under the peculiar language of the statute, viz., "stockholders," that they were liable in whose names the stock was standing, though they had no interest, and it in fact belonged to some one else.

In that case the stock had been hypothecated; the debts had been paid; the creditors had executed a power to transfer, but it had not been transferred.

Thus stood the law when our Legislature entered on the task of carrying out the constitution.

Section 3 of the act of 1849 reached the two-cases in 17 *Mass.* and 2 *Hill.* Section 2 reached the case in 6 *Hill;* and in doing so, in fact re-enacted the 18th section of title 2 of chap. 18 of 1st part of the Revised Statutes, which took effect January 1, 1828, was repealed in 1830, and in 1829 was declared inapplicable to the safety-fund banks.

The case of Roosevelt *a.* Brown (1 *Kern.,* 148), referred to by Judge Mitchell, was on the old provision of the manufacturing company act, which fixed the liability on the "persons composing the company."

So that all the cases in our courts are upon enactments widely different in terms from the act of 1849.

I. This change of language had a purpose. 1. And that was to avoid the hardships of the old rule, of which 6 *Hill,* 624, and 1 *Kern.,* 148, are examples. 2. Next, to put the hardship, not where the courts put it, on the one on whose credit the debt was created, but on the provisions of the constitution, which fastens it on the stockholders, irrespective of the credit given,— on him who in fact was the owner, whatever the appearance.

II. The decision below entirely nullifies the statute, because only one can be the holder, both cannot be : you cannot apportion on both the legal and equitable owner, nor can you choose which. You must take the "stockholders" as the statute defines the term. And that is not merely him who appears to be the holder according to the old ruling, but also who is the equitable owner, though appearing on the books in another name.

III. This idea runs through the whole statute, and is carried out in all its provisions. For instance :—§ 2. As to minors, trustees, and gifts. The persons here made liable never appear to be holders. § 3. The liability attaching at the creation of the debt follows to the assignee of the stock, on whose credit the debt could not have accrued. And so to each subsequent assignee. §§ 4, 5, and 17, provide for keeping a list of stockholders, and giving notices to them. The report is made from the stock ledger, and notice to each on the list. § 10. Stock-

holders owning one-tenth may apply for a receiver. Why? To protect their own interest. Under the old ruling such application could be made only by those having no interest. § 24. After the apportionment, the collections are to be paid to those apportioned, and not to the real owner, so that the nominal owner might have to pay 20 per cent., and receive back 100. § 18. The referee is not bound by the stock list reported, but is to ascertain " who are chargeable as stockholders." Why this, if the mere appearance of being a holder is enough?

IV. The language used in this act, " the term stockholder shall apply," was borrowed from the Revised Statutes. (1 *Rev. Stats.*, 593, § 18. See title " Definitions" in Index, and particularly 1 *Rev. Stats..* 250, § 207, (120.) The term " master" shall be construed to apply to every person having charge, &c. (1 *Rev. Stats.*, 278, § 181, (152.) " Manufacturer" shall be construed to apply to every person having charge, direction, or control of a manufactory, whether as owner or proprietor, or by lease, or hiring from such.

V. The construction of the special term virtually repeals and renders nugatory the second section of the statute.

*J. M. Mason*, for respondent.—I. The act of 1849 is not unconstitutional. 1. It is not in conflict with the constitution of the United States, it not impairing the obligation of contracts. The act is prospective, and only applies to contracts thereafter to be made, and is in obedience to article 8, section 7, of the constitution of the State of New York, which applies in terms only to the debts to be contracted at a future time. 2. It is not in conflict with article 1, section 2, of the constitution of the State of New York. That section gives a right to trial by jury only in cases in which it had been *theretofore* used. (*a.*) No such cases were known specifically before the constitution. (*b.*) The proceeding is purely equitable in its character, and jury trials were unknown in equity cases, except by special statutory regulation. 3. It does not violate article 1, section 6, of the constitution. The parties are not deprived of property without due process of law. The act is under the provision of the constitution ; and the act which carries out a specific provision of the constitution is *due process of law*. (*Constitution, art.* 8, §§ 2–7.) 4. The act does not violate article 8, section 3, of the

constitution. By that section, corporations have the *right to sue*, and are subject to be sued in all courts, in like cases, as natural persons. 5. The act of 1849, instead of being in conflict, is in conformity with the constitution. (Art. 8, §§ 2 and 7.) It was enacted to carry into effect these sections of the constitution. It prescribes the mode of enforcing the general principle affirmed by the constitution. 6. The words of article 8, section 7, of the constitution, "individually responsible to the amount of their respective share or shares of stock for all its debts and liabilities," must mean an individual responsibility *beyond the stock subscribed* to the amount of such stock.

II. The court had not lost jurisdiction of the proceedings for the assessment of the stockholders, by reason of any delay in such assessment, occasioned either by the laches of the receiver or referee, or by the action of the court itself.

III. The section itself is merely directory. It cannot be considered mandatory, so as to defeat the intent of the act, and deprive the creditors of the privileges granted them by the act itself. (*Smith on the Cons. of Stat.*, 782–796 ; The People *a.* Cook, 14 *Barb.*, 259, 290–295, 323, 326, and cases there cited; S. C., 4 *Seld.*, 67, 86.)

IV. All the provisions of the act have been strictly complied with by the receiver and referee. 1. The report of the receiver, required by sections 14 and 15, is in strict accordance with the requisitions of the act. 2. The reference required by section 16 was made, and the order contains every thing required by that section. 3. The referee gave the notices, and caused them to be served in the manner required by section 17. 4. The hearing was had before the referee in the manner required by section 18.

V. The objection, that the United States Trust Company cannot act in this matter, for the reason that its charter is unconstitutional, or that it has forfeited its charter, if not unconstitutional, is not well taken. (United States Trust Company *a.* Brady, 20 *Barb.*, 120 ; affirmed in Court of Appeals.)

VI. Nor is the objection well taken that the stockholders have not the opportunity of contesting the claims with which they are charged. The stockholders would not have had that right before the failure of the bank. It was exercised by their representatives—the Board of Directors. It was, after the failure,

exercised by the receiver, also the representative of the stockholders.

VII. The objection that notices of the apportionment were not properly served, can only be taken by the parties affected by such irregularity.

VIII. The United States Fire Insurance Company appeared by the stock ledger to be the holder of 400 shares of the stock of the bank. These were held as collateral security for a loan of $8500 (afterwards reduced to $5500), made by the Insurance Company to Sloan & Leggett. The stock was transferred to the Insurance Company *on the books of the bank.* The referee charged Sloan & Leggett with the stock. The receiver excepted, and claimed that the stock should be charged to the United States Fire Insurance Company. The court sustained the exception of the receiver. 1. By section 2, stockholders are not only those whose names appear on the books of the bank, but, also, " equitable owners" of stock. 2. The provision of keeping a book for the names of the stockholders is a new *statutory* provision. 3. It is made compulsory upon the bank that this book should " *be open to public inspection.*" 4. The object of these provisions is, that the party about to become a creditor of the bank may know who are the parties individually liable to him, under the constitution and the statute, for the debts the bank are about to contract with him, and that he may be kept constantly informed who these parties are, and what changes are made in them. 5. Without this explanation, the only object of the provisions would have been to satisfy public curiosity. 6. Formerly, a creditor could make his inquiries as to the resources of a bank, its mode of transacting business, and the character of its officers, in the same way as he could with regard to any other party. The constitution and act provided an additional security, viz., the individual responsibility of each stockholder. This would be of no avail to him unless he were able to examine for himself who were the stockholders, and to pass upon their responsibility. 7. Such being the case, the stockholder who allows his name to be upon the books, becomes a guarantor to the creditor to an amount equal to that of his stock.

IX. Elijah F. Purdy, trustee, appears upon the books as holder of 51 shares, as trustee. For this, Purdy is personally chargeable. 1. The mere name of trustee, without any proof

that such trust existed, would not absolve him from his personal liability. 2. He is chargeable as trustee under section 2 of the act, as a "trustee voluntarily investing his trust fund in the stock." 3. If it was unlawful for him to become such trustee, he cannot take advantage of his own illegal acts as against the creditors.

X. Jonathan Purdy applied to the court, on the motion to confirm the report for the allowance of an offset of his claim against the bank, amounting to $1287.39, in opposition to his assessment. The application was refused.

No such offset can be allowed. Each stockholder is liable for a sum equal to the whole amount of his stock. All the creditors have equal claims against all the debtors. No party has the right to assume the position of a *preferred creditor*. If an offset is allowed, and there should be any default in collecting the assessment, the party obtaining the allowance of such offset would become a preferred creditor.

*Sanxay*, for sundry appellants, objected, among other things, that it nowhere appeared in the proceedings that the Empire City Bank was an association or corporation "issuing bank notes to circulate as money," which was a jurisdictional fact, without which there could be no personal liability of the stockholders.

*C. Tracy*, *R. C. Wetmore*, and *C. Shaffer*, for other appellants, were not heard.

By the Court.*—Davies, P. J. (orally).—Without expressing any opinion on the other points raised, the court are unanimously of opinion that this objection is well taken, because the whole proceeding being special and summary, and in derogation of the common law, the statute must be strictly complied with. The power conferred by the statutes can be exercised only in the case of a bank issuing bills for circulation, and it must therefore affirmatively appear that this bank was of that character in order to confer any jurisdiction; and this fact not appearing anywhere in the case,

Judgment is reversed.

---

* Present, Davies, P. J., and Sutherland and W. F. Allen, JJ.